J-A27009-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| GABRIEL CALHOUN | : | No. 520 EDA 2024 |

Appeal from the Order Entered February 2, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003148-2021

BEFORE:  BOWES, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BOWES, J.:                    **FILED MARCH 3, 2026**

The Commonwealth of Pennsylvania appeals from the order granting the motion for extraordinary relief filed by Gabriel Calhoun ("Appellee"), thereby awarding him a new trial.  We reverse and remand for additional proceedings.

The trial court summarized the pertinent background, arising from the evidence introduced at a jury trial, as follows:

> The events central to this case took place on New Year's Eve of 2020 into New Year's Day of 2021.  . . .
>
> The complainant[, N.D.,] went to the house of her friend Alexis Vautrin to have dinner and alcoholic drinks prior to their evening plans.  They planned to go to the home of [Vautrin]'s boyfriend, Ani Okeke Ewo, who lived with his roommate and Army colleague[,] Appellee's brother[,] Darius Brown.  . . . Ewo and . . . Brown lived in a three-bedroom home.  One of the bedrooms was considered to be Appellee's room as Appellee was in the process of becoming a roommate to Ewo and Brown, was the only person beside Ewo and Brown who knew the security code for the home, stayed in that front bedroom at the house "every weekend and

occasionally during the week if he had free time[,]" and kept his clothing in that bedroom.

The plan for the evening was for [N.D.] and . . . Vautrin to go to Ewo's and Brown's house, and then go out with Appellee and his brother to two different New Year's parties together as a group and to sleep over at Ewo and Brown's house. It was New Year's Eve and the group drank alcohol that evening. [N.D.] testified that prior to joining the others that evening, she and . . . Vautrin dressed, had dinner and "one or two White Claws" and "maybe a shot or two" of vodka, after which they proceeded to . . . Ewo's house.

After going to Ewo and Brown's house, [N.D.], Vautrin, and Ewo went to a New Year's Eve party without Appellee and his brother and only stayed there for thirty minutes and then left for a second party. At the second party, the three met up with Appellee and . . . Brown and, although [N.D.] did not remember how long they were there, she testified that she had "quite a few" shots at this other party hosted by . . . [A]rmy recruiter Angela Dunston[.] At the party, [N.D.] was at times apparently in a blackout state but appeared awake and aware as she interacted exclusively with Appellee . . . [and] testified that she did not remember various events from the party due to being in an alcohol-induced blackout. Evidence presented at trial proved [N.D.] danced with and kissed Appellee and appeared to be awake and aware.

The parties disagree on what occurred after [N.D.], . . . Vautrin, and . . . Ewo left the party. What is agreed upon is that . . . Brown and . . . Appellee did not leave the party[ with the rest of the group,] but stayed until 3:00 or 3:30 a.m.

According to the Commonwealth's rendition of facts, [N.D.], despite not remembering, was taken back to Ewo's house by Ewo and Vautrin, vomited on herself [in the front bedroom where Appellee normally slept], showered, was dressed and aided by Vautrin, and Vautrin and Ewo placed her in [back into the same bedroom, where she promptly passed out]. [Vautrin provided this account at trial, confirming that even after the vomit was cleaned, the room "re[e]ked." N.D.] testified that when she came to, Appellee was on top of her with his genitals inserted into her genitals. [N.D.] testified that she froze and that when he had "finished, or ejaculated" she pushed him off of her and went

- 2 -

upstairs to find Vautrin. At this point, Vautrin had Ewo take them back to Vautrin's house, asked [N.D.] if she wanted to go to the hospital, and spoke to Ewo on the phone after she and [N.D.] reached her house. [N.D.] declined to go to the hospital and instead called her mom to pick her up.

It would not be until later in the evening that same day and after much prompting from her mother that [N.D.] decided to meet with the Philadelphia Special Victims Unit [("SVU")] and had swabs taken [by staff at the Drexel University College of Medicine Philadelphia Sexual Assault Response Center]. The detectives interviewed [N.D.] at the SVU, although [N.D.] was concerned that she did not want to ruin Appellee's life and she was coaxed to continue to give the statement and detectives told her she could decide whether to go forward after giving her statement.

In the statement, which was entered into evidence, when asked if she had at any time told Appellee to stop, [N.D.] answered "no." [At trial, though, N.D. testified that she remembered telling Appellee to "please stop." N.T. Trial, 7/26/23, at 127.] The detectives conducted in-person interview of [N.D.] and her mother, however [they] only conducted telephonic interviews of the remaining witnesses, which the detectives put into statement form. The telephonic statements were neither verified nor read by the witnesses, and some of the statements were paraphrased by the detectives with no way for the "witnesses" to know what the detectives memorialized in the statement and no way for the affiants to review and make changes. [As will be discussed in more detail below, the Commonwealth admitted into evidence a report generated by the Philadelphia Sexual Assault Response Center ("PSARC"), which in relevant part contained N.D.'s responses to certain questions relating to the assault.]

Appellee did not testify but presented a different series of events. . . . Ewo, who was called as a witness by the Commonwealth, testified to the same initial events, such as drinking prior to the party, attending the party, and returning to [his] house later that evening without Appellee and Brown. Ewo's rendition of events confirmed that Appellee and [N.D.] consensually danced with each other and shared a kiss at midnight and he repeatedly described [N.D.]'s interactions with Appellee as though "they were dating." This was supported by defense

witness . . . Dunston, [the A]rmy recruiter who hosted the party and testified that she assumed [N.D.] "was Appellee's girlfriend."

The assistant district attorney told the jury on five separate occasions that, when Ewo told Appellee that [N.D.] was upset and asked what happened [after the assault], Appellee answered "nothing happened." However, . . . Ewo testified that during his phone interview with police, he never told police that Appellee said "nothing happened" between Appellee and [N.D.], adamantly testifying that when he asked Appellee about it, Appellee "seemed extremely shocked" and reacted in "total disbelief of what . . . Ewo was saying" but never said "nothing happened."

Appellee presented four live character witnesses who testified positively regarding Appellee's character. . . . Brown, Appellee's brother, testified that Appellee was "a peaceful, law-abiding person" and that Appellee was "very humble." Mary Powell, who knew Appellee his entire life, testified that Appellee "has a beautiful reputation" for being both "a peaceful person" and "law-abiding." Felicia Woods-Adams, who knew Appellee since he was [four years old], testified that she had "never heard anything about Appellee being untruthful, unpeaceful" and that his reputation for being peaceful was "excellent based on that we hear and read in the papers." Francis Kilson, who worked with Appellee and had known him for sixteen years, testified that Appellee had an excellent "reputation for being a peaceful person" as well as "for being a truthful person."

In addition, a stipulation was reached between counsel that Appellee had ready an available [nineteen] other named character witnesses who would testify that Appellee had "an excellent reputation for peacefulness, for truthfulness, and for being a law-abiding person." Ultimately, defense counsel argued that the sexual encounter between Appellee and [N.D.] was the product of consent, not the result of sexual misconduct on his behalf.

A jury trial took place from July 26 . . . through July 28, 2023[,] after which the jury found Appellee guilty of sexual assault, not guilty of rape of an unconscious, unaware, or mentally disabled person, and not guilty of indecent assault without consent of the other. Thereafter, on November 3, 2023, [prior to sentencing,] Appellee presented an oral motion for extraordinary relief in the form of a new trial asserting that the jury's guilty verdict for sexual assault was against the weight of the evidence

presented at trial. On February 2, 2024, after a thorough review of the trial court record, all available evidence, and arguments presented by counsel for both sides, th[e] court [orally] granted Appellee a new trial.

Trial Court Opinion, 1/27/25, 4-10. The court's order also granted the Commonwealth's "request for status of a possible appeal." Docket, 2/2/24.

The Commonwealth thereafter timely appealed. On April 16, 2024, the trial court entered an order erroneously directing Appellee, as opposed to the Commonwealth, to file within twenty-one days a concise statement of errors pursuant to Pa.R.A.P. 1925(b). The Commonwealth filed a statement on June 26, 2024.[1] The court authored a responsive opinion.

The Commonwealth presents the following issue for our resolution:

> Did the lower court err in granting [Appellee]'s motion for extraordinary relief and a new trial on the ground that the verdict was against the weight of the evidence, when the verdict was logically based on the evidence and did not shock one's sense of justice, and when the lower court's stated reasons for concluding otherwise are unsupported by the record and offer little more "than its assessment of the credibility of the witnesses and lack the necessary foundation for the required concomitant finding of a serious miscarriage of justice"? ***Commonwealth v. Widmer***, 744 A.2d 745, 754 (Pa. 2000)[.]

Commonwealth's brief at 4 (brackets omitted).

---

[1] Neither the trial court nor Appellee advocate that the Commonwealth has waived all claims on appeal by untimely filing its concise statement of errors more than twenty-one days after the court's order. We decline to do so here when the order was addressed to the wrong party, and furthermore the certified docket does not reflect that the order was served in accordance with our procedural rules. ***See*** Pa.R.Crim.P. 114(C) (requiring that the docket reflect, *inter alia*, "the date of service of the order or court notice").

We begin with the legal tenets pertinent to our review. Pennsylvania Rule of Criminal Procedure 704 states, in relevant part:

**(B) Oral Motion for Extraordinary Relief.**

(1) Under extraordinary circumstances, when the interests of justice require, the trial judge may, before sentencing, hear an oral motion in arrest of judgment, for a judgment of acquittal, or for a new trial.

(2) The judge shall decide a motion for extraordinary relief before imposing sentence, and shall not delay the sentencing proceeding in order to decide it.

Pa.R.Crim.P. 704(B).

The court here granted a new trial on the basis that the verdict in question was against the weight of the evidence. The following standard of review applies to such a claim:

A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

**Commonwealth v. Martin**, 323 A.3d 807, 823 (Pa.Super. 2024) (citing **Widmer**, 744 A.2d at 751-52).

Additionally, "[a]n appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court." *Commonwealth v. Arias*, 286 A.3d 341, 352 (Pa.Super. 2022) (citation omitted). "Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." *Id*. (citation omitted). Further, "[a]n abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Santos*, 176 A.3d 877, 882 (Pa.Super. 2017) (citation omitted).

Appellee was convicted of sexual assault, which is defined thusly: "Except as provided in [§] 3121 (relating to rape) or [§] 3123 (relating to involuntary deviate sexual intercourse), a person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent." 18 Pa.C.S. § 3124.1. Since the statute lacks an express *mens rea*, our High Court has determined that the Commonwealth must prove that a defendant acted at least recklessly with regard to the victim's lack of consent. *See A.L. v. Pennsylvania State Police*, 274 A.3d 1228, 1240 (Pa. 2022) (citation omitted). The Pennsylvania Crimes Code elucidates:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result

from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(3). Additionally, we have recognized that lack of consent may be shown when the victim "was intermittently unconscious throughout the assault and was at all relevant times in such impaired physical and mental condition so as to be unable to knowingly consent" to sexual activity. *See Commonwealth v. Diaz*, 152 A.3d 1040, 1046 (Pa.Super. 2016) (citation omitted).

In granting Appellee a new trial, the trial court specified in its Rule 1925(a) opinion that it relied upon three particular pieces of evidence that it asserts the jury ignored, as well as testimony generally supporting the notion that Appellee did not form the requisite *mens rea* for sexual assault. The Commonwealth argues against each of these points, contending that the court usurped the role of the jury and engaged in speculation to reach certain conclusions based on the evidence provided at trial. *See*, *e.g.*, Commonwealth's brief at 16. We outline the trial court's proposed reasons *seriatim*.

First, the court opined that the jury could not convict Appellee of sexual assault "without ignoring the documentary evidence of the PSARC report." Trial Court Opinion, 1/27/25, at 18. By way of background, this report was generated after N.D.'s statement to police and medical testing with PSARC. The document is approximately twelve pages long and contains information

about N.D. and the assault. **_See generally_** Commonwealth's Trial Exhibit 8.

Relevant to the trial court's consideration, the form contains a list of questions

as to the attack, and offers a place to mark a response for "No," Yes,"

"Attempted," and "Unsure." Next to each response is a space where additional

details can be provided. Notably, N.D. responded to a multitude of questions

with "Unsure," including whether there was any oral copulation of genitals by

ether N.D. or Appellee, licking, kissing, biting, ejaculation by Appellee,

lubrication used, contraceptives used, or penetration of N.D.'s vagina with

either a finger or an object.

The trial court placed significant emphasis on the fact that N.D. indicated

on the form "Yes" that Appellee placed his genitals into hers, and that he did

not penetrate her anus with a finger or foreign object, yet claimed "Unsure"

as to most other acts. Particularly, it highlighted that she made this

designation with respect to whether there was kissing or whether she

performed oral sex upon Appellee. **_See_** Trial Court Opinion, 1/27/25, at 19.

Based on this, the court reasoned as follows:

> This holds much weight because the PSARC report, ignored by the jury, shows that she would have had to have been an active participant in the kissing and/or oral sex yet did not remember, indicating that she was in a blackout but participating. Actively performing oral sex on Appellee and/or kissing Appellee would show the complainant was not asleep and also would objectively give Appellee the impression that the complainant was alert and aware, was a willing participant, in addition to her never saying "no" or "stop."

**_Id_**.

Next the court focused on a video introduced at trial "proving the complainant, while in a blackout, appeared awake and aware" at the New Years' party. *Id*. at 20. It noted that despite N.D.'s inability to remember details of the night, the video showed her to be "awake, aware, and in full participation while actually being in an alcohol-induced blackout." *Id*. at 20-21. The court stated that "[t]his led to the court reasonably finding that the jury ignored that [N.D.]'s consistent lack of memory of major portions of the video, although appearing completely awake and aware, would extend to her not remembering participating in the [later] sex act." *Id*. at 24. Therefore, it concluded that "[b]ased on what the video showed the court and the jury, Appellee was not reckless for being unaware that [N.D.] was in a blackout and incapable of consent." *Id*. at 23.

Third, the court opined that "the jury ignored documentary evidence of [N.D.]'s statement to detectives proving that she never told Appellee to stop." *Id*. at 25. It recalled that whether she said this to Appellee was a contested point at trial, and that her trial testimony that she told him to "please stop" during the assault was in direct contradiction to her statement to detectives. *Id*. The court maintained that it "reasonably attached much weight to this contradiction in determining that the jury, in ignoring the documentary evidence of this statement and finding Appellee guilty of sexual assault, was contrary to the weight of the evidence." *Id*. at 27. The court insisted that this assessment was not merely reweighing N.D.'s credibility, but rather was assigning proper value to undisputed documents supporting N.D.'s

contemporaneous recollection at the time of the incident over her memory at trial. *Id*. at 27-28.

Lastly, the court discussed that Appellee would not have been able to observe certain matters, such as every drink N.D. imbibed during the evening or N.D. vomiting at Ewo's house, which would "negate the *mens rea* of knowing or reckless disregard of the complainant's lack of consent[.]" *Id*. at 28. The court further recounted that the Commonwealth's witnesses testified to the vomit being cleaned up prior to the assault, making it "less likely" that Appellee would have been aware of it and which undermined the testimony of Vautrin that the room nonetheless reeked after cleaning. *Id*. at 30. In sum, the court concluded that the above factors supported its grant of Appellee's motion for extraordinary relief.[2]

In response, the Commonwealth argues first and foremost that the trial court violated Rule 704(B) by delaying sentencing for months to rule on the post-trial motion for extraordinary relief, which is generally reserved for "errors so manifest that immediate relief is essential[.]" Commonwealth's

---

[2] The court also claimed that its decision to grant Appellee a new trial factored in that Ewo "repudiate[ed] his police interrogation" answers at trial. *See* Trial Court Opinion, 1/27/25, at 31. Specifically, while his statement indicated that Appellee exclaimed that "nothing happened" when Ewo confronted Appellee after the incident, at trial, Ewo attested that Appellee simply appeared to be in shock in response to the accusation. The trial court conceded that this "brushes up against reassessing [Ewo's] credibility for the jury." *Id*. As such, we will not address this claim further. *See*, *e.g.*, *Commonwealth v. Rivera*, 238 A.3d 482, 495 (Pa.Super. 2020) ("A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion").

- 11 -

brief at 17. It next contends that the trial court invaded the province of the jury by reassessing the credibility of witnesses. *Id*. at 18. The Commonwealth compares the court's conduct here to the erroneous actions of the trial court in *Widmer*. *Id*. at 20-22. There, our Supreme Court held that the trial court erred in granting a new trial when it afforded less weight to the victim's testimony compared to the appellant's account of a sexual assault as it "ignore[d] the context in which the act of intercourse occurred[.]" *Widmer*, 744 A.2d at 754; *see also id*. at 753 (noting that a "person assaulted while sleeping would be unable to recount with certainty events that occurred while she was asleep and simultaneous to her awakening" and that "in those circumstances[,] a witness would be unable to refute the testimony of her attacker regarding alleged conversation or actions that took place between the two of them while she was asleep").

With respect to PSARC report, the Commonwealth avers that there was no evidence of any oral sex occurring during the incident, let alone anything to suggest, as the trial court states, that the victim performed oral sex on Appellee. *See* Commonwealth's brief at 27. It maintains:

> N.D.'s inability to definitely rule out the possibility of certain other acts that [Appellee] may have performed on her while she was asleep or otherwise not fully conscious is hardly surprising, let alone suggestive that she had somehow awakened and (despite having recently vomited all over herself) become interested in performing oral sex on [Appellee]—but then immediately forgot that she had done so.

*Id*. at 27-28.

As to the video evidence of N.D. at the party showing her to be alert and awake, the Commonwealth asserts that the court's inferences therefrom distort the evidence. It contends that the evidence clearly established that the victim's status **changed** throughout the night, and that while she may have been lucid at the New Year's party at the time the video was shot, she later became so intoxicated that she was falling over at the party, and subsequently vomited at Ewo's house and passed out after being cleaned up by Vautrin. *Id*. at 23-24. The Commonwealth states that the only evidence concerning the victim's condition immediately before the assault came from Vautrin, who indicated that she had to help the victim shower, dress, and into bed while Ewo cleaned the vomit in the bedroom. *Id*. at 25. The Commonwealth concludes that the court erred by relying so heavily on a video that depicted the victim's condition hours before the incident as probative of her condition or actions during the assault. *Id*. at 25-26.

Next, as to the purported contradiction in N.D.'s testimony regarding whether she told Appellee to "please stop," the Commonwealth argues that this is irrelevant because the assault was completed at the time she awoke with him already penetrating her. *Id*. at 30. As such, it maintains that the jury very well could have resolved this discrepancy in favor of Appellee and still convicted him of the crime. *Id*. at 30-31.

Finally, the Commonwealth points to evidence of record demonstrating that Appellee either knew, or should have known, that N.D. was inebriated to the point of being incapable of giving consent. It avers that she was in

Appellee's presence throughout the evening and was showing outward signs of impairment at the party, particularly by stumbling and knocking things over, which caused a small commotion. *Id*. at 32-33. It also argues that "it is difficult to take seriously the [trial] court's apparent reasoning that [Appellee] would have had no clue that N.D. had just become ill to the point of vomiting all over herself if he did not personally **observe** her vomit." *Id*. at 33 (emphasis in original). This is because Vautrin confirmed that the room still "reeked," despite the vomit being cleaned and the sheets of the bed being changed. Accordingly, the Commonwealth avers that the court's "guess" that Appellee "likely would have been unaware" of the vomit lacks evidentiary support.[3] *Id*. at 34.

Upon review of the certified record and the applicable law, we conclude that the trial court abused its discretion in granting Appellee's motion for extraordinary relief and awarding him a new trial. Specifically, the court violated the precept that "[a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Martin*, 323 A.3d at 823. Our review of the record aligns with the Commonwealth's assertions that the court here

---

[3] The Commonwealth additionally devotes a section of its brief to arguing that the trial court's misrepresentation of facts in the record reflects its biased opinion that Appellee should never have been prosecuted, suggesting that one basis was his potentially bright future in the military, following in the footsteps of his brother. *See* Commonwealth's brief at 35-37. Since our disposition is premised upon the evidence relied upon by the court in its Rule 1925(a) opinion, we do not address this contention.

placed undue weight upon evidence that does not logically support its findings, and likewise invaded the province of the jury by reassessing the credibility of witnesses. Stated another way, the court's actions represent an "overriding or misapplication of the law" pertaining to its review of Appellee's weight claim, resulting in an abuse of discretion. ***See Santos***, 176 A.3d at 882.

To begin, we cannot accept the inference the trial court attributed to the PSARC report, somehow suggesting that N.D. engaged in oral sex or kissing with Appellee during the assault merely because she answered "Unsure" as to those questions on the document. As indicated, that report contained numerous questions, the vast majority of which the victim proclaimed that she did not know the answer. As our High Court elucidated in a factually similar case, this is hardly unexpected in light of her account that she had awoken from passing out with Appellee penetrating her. ***See Widmer***, 744 A.2d at 753 ("A person assaulted while sleeping would be unable to recount with certainty events that occurred while she was asleep and simultaneous to her awakening. A sleeping person may be confused upon being awakened to encounter a stranger on top of her engaging in sexual intercourse."). We do not see how the fact that she was uncertain whether there was oral sex or kissing generally supports the court's conclusion that she, in fact, engaged in that conduct but failed to recall it, which in turn would negate Appellee's state of mind.

This is especially true when N.D., consistent with her testimony, answered "Unsure" as to many other questions, such as whether there was

licking, biting, use of contraceptives or lubrication, ejaculation, or penetration of the vagina with a finger or object. The testimony bore out that she simply did not know what happened before she regained consciousness, and the court improperly discounted the importance evidently assigned to this evidence by the jury. *Id*. at 753-54 ("By finding the testimony of [the victim] lacking in weight in contrast to the testimony of appellant, the trial court failed to properly consider the context from which that testimony sprang and the nature of the charges at issue.").

Next, the video of the New Years' Eve party plainly could not support the trial court's contention that N.D. was "awake and aware in a blackout" during the sexual assault, *see* Trial Court Opinion, 1/27/25, at 25, merely because she was purportedly in that condition at the party. The video was undisputedly taken multiple hours before the assault occurred. The court appeared to presume, without evidentiary support, that N.D.'s condition was incapable of changing throughout the hours of the morning. Moreover, the court's position blatantly disregarded the uncontradicted testimony of multiple witnesses who confirmed that N.D.'s intoxication progressed during the evening until reaching the point of her vomiting in Ewo's house and passing out. The video therefore was not an adequate basis for overturning the jury's verdict, as it was not logically connected to the court's belief that N.D. was in a blackout during the sexual assault. *See Widmer*, 744 A.2d at 754 (holding that "[d]iscretion is abused where it is not exercised on a foundation of reason" and finding an abuse of discretion when the trial court's proffered reasons to

support the grant of a new trial "lack[ed] the necessary foundation for the required concomitant finding of a serious miscarriage of justice").

Additionally, the court erred insofar as it relied upon a contradiction in the victim's testimony as grounds for granting a new trial. As the Commonwealth argues, whether the victim purportedly told Appellee to "please stop" in the middle of the attack is not relevant to whether the jury was within its rights to convict Appellee for beginning the assault without N.D.'s consent. *See*, *e.g.*, *Commonwealth v. Cramer*, 195 A.3d 594, 602 (Pa.Super. 2018) ("It is well established that "resistance to sexual assault is not required to sustain a conviction." (cleaned up)).

Finally, we agree that the trial court erroneously placed significant weight upon testimony that it believes negated Appellee's *mens rea*, none of which is dictated by a review of the record. Assuming *arguendo* that the court's belief is true, namely that Appellee did not observe every drink that N.D. consumed throughout the night or see N.D. vomit at Ewo's apartment, this does not provide a reason for overturning the jury's verdict. Without passing any judgment on the credibility of the various witnesses, we note that the Commonwealth provided bountiful circumstantial evidence that could assuage any juror's potential doubts in this regard. *See Arias*, 286 A.3d at 352 (directing that appellate review does not entail addressing "the underlying question of whether the verdict is against the weight of the evidence"). This evidence included the facts that Appellee was consuming alcoholic beverages alongside N.D. at the party for a substantial period, N.D. displayed outward

signs of impairment hours before the assault, and that despite her vomit being cleaned up, the bedroom in question nonetheless "reeked" shortly before the incident occurred. It was for the jury to weigh these considerations at trial. The trial court's stance, that some testimony made it "less likely" that Appellee knew of N.D.'s inability to consent, is not "so clearly of greater weight that to ignore [it] or to give [it] equal weight with all the facts is to deny justice." **Martin**, 323 A.3d at 823. For all of the above reasons, we find that the trial court abused its discretion in granting a new trial.

In sum, we reverse the order granting Appellee's motion for extraordinary relief and granting him a new trial, and instead remand for him to be sentenced for his sexual assault conviction.

Order reversed. Case remanded for sentencing. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/3/2026